UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ] |
| v. | ] Criminal No. 14-cr-124 |
| LINWOOD BARNHILL | ] Judge Collyer |

UNITED STATES OF AMERICA ]
                          ]
            v.            ]    Criminal No.  14-cr-124
                          ]
LINWOOD BARNHILL          ]    Judge Collyer
                          ]

SENTENCING MEMORANDUM

Defendant Linwood Barnhill, through undersigned counsel, respectfully submits the following memorandum in support of sentencing.

Mr. Barnhill entered a pre-indictment plea of guilty in this case.  Mr. Barnhill, along with the Government, requests that the Court accept a sentence of 84 months incarceration, as agreed to and proffered by the government and defense under F.R.Cr.P. 11(c)(1)(C).

*Background and Circumstances of Mr. Barnhill*

Mr. Barnhill is a 48-year old District of Columbia native.  He joined the Metropolitan Police Department in 1989, within a few years of graduating from high school.  A year after he joined the force, in 1990, Mr. Barnhill was in an terrible police car accident, requiring extended medical leave from work.  According to a Washington Post article, 5 officers were hospitalized after a collision of 2 police cars while responding to the aid of another officer on May 25, 1990.  (Mr. Barnhill was not a driver.)  An ROTC officer who was the first to help at the scene described "a horrible, horrible impact.  Those people inside were tossed like rag dolls in a hurricane."

All officers, including Mr. Barnhill, were hospitalized.  He was subsequently on medical leave for months.  Mr. Barnhill reports that after returning to work he had panic attacks while riding in cars, requiring treatment to learn to ride in police cars without having episodes of severe anxiety.  It appears that he had post traumatic stress disorder.

Mr. Barnhill entered the police department at the height of the city's crack epidemic.  After his return to work, he inevitably saw incidents and scenes involving drugs, violence, and their aftermath.  Mr. Barnhill was assigned to a police district where drug abuse and violence were rampant.   His encounters with the fallout of the crack epidemic were not limited to strangers.  During this time he tried to mentor  a young man who he later saw as a homicide victim.   The work takes a toll.   Some persons, like Mr. Barnhill, felt the impact more than others.

Mr. Barnhill reports that he was in a passenger in a civilian car accident in the mid-1990's, which required hospitalization and extended leave of absence from work.

Despite his own serious injury and trauma, Mr. Barnhill gave extra assistance to citizens on the beat, and earned commendations for his service.  Citizens and fellow police officers commended Mr. Barnhill for going far beyond the call of duty to help citizens of the District of Columbia.  The defense provided the Probation Office with 30 pages of certificates and commendations for Mr. Barnhill.[1]

On more than one occasion, Mr. Barnhill received an MPD agency-wide officer of the month award:

- In 1998, Mr. Barnhill and 2 other officers apprehended a suspect after receiving notice of a rash of auto thefts.   The officers

---

[1]  These documents were also submitted to chambers and the government, as Exhibit A1-30, as they contain personal information over a number of years from different persons.

reviewed the crime maps and targeted the street where the suspect was later apprehended.[2]

- Mr. Barnhill and another officer located a gun and drug stash while on foot patrol in Barry Farms in 2002.  Special note was made that those officers' "...footbeat is considered to be extremely violent and rife with illegal drug activity.  Their courage and dedication to duty in a dangerous area of the [police] District is deserving of this recognition."[3]

Mr. Barnhill also received commendations from MPD for specific acts of outstanding police work.  These included his participation in 1993 of the MPD response to a robbery-holdup.  In 1993 he also helped in a pursuit involving a car jacking where 2 small children, ages one and three, were reported inside the vehicle.  That same year he was cited for the pursuit of two men, believed to have guns, in a stolen car.  On a lighter note, he also volunteered his time for his police district's community-wide events.[4]

Importantly, in addition to these police commendations, Mr. Barnhill received special recognition from citizens for his care and compassion while "working the beat."  For example, a citizen wrote to the police chief in 1991, commending Mr. Barnhill for his followup visits to their home after the family filed a police report regarding their abusive son.  One visit to check up on the family even occurred on Christmas day.   (Exhibit A1.)  In 1994, a citizen wrote to the police chief and the

---

[2] Exhibits A5-16.

[3] Exhibits A23-24.  Mr. Barnhill reports that he also received an officer of the month award for intervening in a Rite-Aid robbery, not included in the documents.

[4] Exhibits A4, 6, 7, 26, and 27 are referenced in this paragraph.

mayor commending Mr. Barnhill for his help after his car broke down during rush hour on a commuter bridge. This was a dangerous situation, but Mr. Barnhill helped the man while ensuring his safety. He called Officer Barnhill "truly one of the unsung heroes." (Exhibits A9-11.)  In 1995, a citizen's group wrote to the Seventh District Inspector to thank Officer Barnhill and another officer for ridding the neighborhood of illegal activities, and making sure that employees were safe when working late. (Exhibit A13.)

Unfortunately, Mr. Barnhill's mental health issues were exacerbated after the year 2000. MPD records[5] document that Mr. Barnhill's close sister died of cancer at a young age in late 2001, and on the 2002 anniversary of her death he became completely incapacitated by depression. Records confirm that he was required to take medical leave from work for a full year, returning to limited duty only in December, 2003, and full duty in April, 2004.

While he was able to return to work full time for several years, other untimely deaths lead to a major setback and another breakdown. Mr. Barnhill had a long term live-in relationship with a woman and her son. He regarded her son as his own son, and helped to raise him. Long after the adults separated, he continued to be a father figure to the son, and the son lived with Mr. Barnhill as an adult. The young man died of a brain aneurysm in approximately 2007, at age 22. Mr. Barnhill found the son unresponsive in bed in his house, and he died shortly afterward. Mr. Barnhill no longer wanted to live in the house, and it eventually went to foreclosure.

In 2008, Mr. Barnhill's brother died suddenly of a heart attack.  The anniversaries of these two deaths completely overwhelmed Mr. Barnhill. He had been on leave beginning April, 2011, but was supposed to return in July. Records confirm that in July, 2011, when Mr. Barnhill was supposed to be at work, a

---

[5] Counsel obtained MPD mental health records beginning in the year 2000.

4

supervisor located Mr. Barnhill at home, sobbing uncontrollably, and took him to emergency treatment. He acknowledged to counselors that he had experienced serious thoughts of suicide several months earlier. Mr. Barnhill also acknowledged to counselors that the family deaths had disabled him - particularly the anniversary of his son's birthday. In late August, 2011, Mr. Barnhill was medically cleared to return to work full time.

Mr. Barnhill's hypertension and diabetes also led to work absences, and no doubt contributed to his depression. He reported to counselors that the absences added a financial strain to his emotional frailty.

A year later, in September, 2012, Mr. Barnhill accidentally discharged his weapon at home. His injuries required surgery and hospitalization for one month, followed by placement at a rehabilitation facility for a month. He had no sick leave, and was able to use donated sick leave by other department members for only a short time. In April, 2013, he was once again struck by an untimely death. An officer who joined the police department with Mr. Barnhill was unexpectedly and tragically shot and killed by his stepson. Mr. Barnhill considered this officer a friend, and they had remained in contact over their careers. His death came as a shock to Mr. Barnhill. But by that time Mr. Barnhill had already been out of work, including loss of income, for 7 months. He had sufficiently recovered from his physical injuries to return to work, with limited police powers, in May, 2013.

For most friends and coworkers, Mr. Barnhill hid his depression behind laughter and joviality. One friend and coworker noted that he would tell jokes at roll call to relieve stress. This relieved tension in his own life and also lessened the tension for his coworkers before going out on the street to perform their duties. Even high

ranking officials would sit in roll call to hear him.[6]  This cover of humor is certainly not unusual for someone suffering from depression.  But he reported to counselors during medical leave in July, 2011,  that "he does not like to talk with others about his problems - has played the 'funny man' at [his district] over the years - feels no one really wants to listen to him."  He felt isolated and alone.

As noted in work commendations as well as letters to the court, people viewed him as a likeable, kind and generous person, who helped others.  And he does have a kind and generous nature - this could not be feigned over his many years of service to the community.  But he also suffered from documented severe and debilitating depression, which made every day a struggle.  Occasionally there were cracks in his facade of humor - people witnessed his tears, physical shaking or similar signs of distress.[7]  Recently, he had a great deal of difficulty finding the energy to care about himself, or those around him.  This depression greatly contributed to his bad decisions, for which he acknowledges his own personal responsibility, and which bring him before this court.

<u>Circumstances of the Case</u>

While Mr. Barnhill has accepted responsibility for his acts, It is critical that the extent of Mr. Barnhill's culpability be stated.  The government acknowledges that the charges were not in any way related to his work as a police officer, or use of police powers.   The complainants had no idea that he was a police officer, and he never used police powers in any way in relation to this case.

The government exhaustively investigated this case over a period of months,

---

[6]        Letters of support, Exhibit B. (Counsel has submitted copies of these letters to chambers and the government, as they contain personal and privileged information.)

[7]        See, eg, Letters of support.

and did not find that Mr. Barnhill had illegal activities with any other minors. Unlike most guilty pleas for either pandering or child pornography, he has pled guilty to all minors with whom he had illegal activities.

Most important, Mr. Barnhill did not threaten, use violence, coerce or exercise control over the females in the information. The females chose when to enter the apartment, leave the apartment, and when to have contact with Mr. Barnhill. No females lived in the apartment. There are no allegations that any females, including the three complainants, stayed at his apartment overnight. According to the government's own evidence, the three government witnesses were not frequent or regular visitors to the apartment.

The parties agree that the choices expressed by the females were final. Mr. Barnhill did not try to coerce or threaten any female who declined any offer or suggestion he made. We know this because these females state that they did, in fact, decline suggestions made by Mr. Barnhill. Mr. Barnhill did not pursue the discussion, or attempt to contact them when they chose to stop contact.

Mr. Barnhill accepted this plea even though he was unaware of the true ages of the females involved. He stresses to the court that he did not, in fact, know that the females were under 18 years of age. He recognizes that he is responsible for his actions regardless of his belief at the time that the females were 18 years or older. Had the facts been as Mr. Barnhill thought, we would be in a much different posture today. In fact, Mr. Barnhill would not be in Federal Court.

Mr. Barnhill did not distribute the photos he took of the complainants. The photos he took were not emailed or otherwise distributed. The still photos were not illegal, and were not intended for illegal distribution.

Mr. Barnhill did not use a computer for pornography or any other illegal acts.

Mr. Barnhill pled guilty to one count of child pornography for videotaping an

act which all parties agree was consensual, and also for which no one was paid. The complainant in that count was within a year of 18 years old - the age at which the video would not be illegal.  The government has found no other child pornography cases in this jurisdiction where the female was 17 years old; all have involved younger females.      The child pornography statute assumes the images taken are of an underlying criminal act, but here, the underlying videotaped act was not illegal.  Indeed, child pornography charges are often focused on images of prepubescent children. This is a very unusual case, and possibly unique in this jurisdiction.

In addition, an underlying purpose of the child pornography statues is to punish distribution of images.  Here, no one disputes that the video was not distributed, nor was it intended for distribution.  In fact, Mr. Barnhill believed he had deleted it from his phone.   While this is not a defense to the charge, it is certainly a factor that the court should consider in sentencing Mr. Barnhill.

Importantly, the video was the only illegal visual imaging taken by Mr. Barnhill.  There were no other pornographic videos or still photos on any electronic devices in Mr. Barnhill's apartment, or otherwise attributed to Mr. Barnhill.

The parties agree that Mr. Barnhill does not suffer from pedophillia - he did not search out persons he believed to be prepubescent.  Likewise, it cannot be said that he sought out teens under the age of 18 years.  Mr. Barnhill plead guilty to all persons who the government learned, after extensive investigation, were under 18 years of age.

*Considerations in Imposition of Sentence*

18 U.S.C. § 3553(a) requires that this Court impose a sentence that is "... sufficient but not greater than necessary" to comply with the purposes of

8

sentencing as set forth in 18 U.S.C. §3553(a).

In <u>United States v. Booker</u>, 543 U.S. 220 (2005), the U.S. Supreme Court held that the U.S. Sentencing Guidelines are advisory only - not mandatory.   In <u>Rita v. United States</u>, 551 U.S. 338,351 (2007), the Supreme Court further explained that "...the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines should apply."   The court can no longer presume that a Guidelines sentence is the appropriate sentence.  To do so would be to take a large step in the direction of returning to the pre-Booker regime.  <u>United States v. Pickett</u>, 475 F.3d 1347 (D.C. Cir. 2007).

The section 3553 factors to be considered in imposing a sentence that is sufficient but not greater than  necessary include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed-
> > (A) to reflect the seriousness of the offense, to  promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the advisory guidelines  range;
> (5) any pertinent policy statements issued by the Sentencing Commission;
> (6) the need to avoid unwarranted sentence disparities; and
> (7) the need to provide restitution to any victims of the offense.
> 18 U.S.C. § 3553(a)

Factors that warrant the proposed sentence under section 3551 are detailed below.

*Punishment*

An 84-month sentence of incarceration is only a part of the punishment that Mr. Barnhill receives in this case.   That sentence, in and of itself, is very severe.  But given Mr. Barnhill's physical and mental health issues, as well as his age and family history, a 7-year sentence is much more punitive than for a younger, healthier person.

Mr. Barnhill acknowledges that he contemplated suicide prior to his arrest, and was initially placed on suicide watch at the D.C. Jail.  He is presently in the mental health section of the Jail.

Mr. Barnhill suffered from another death while incarcerated; he lost his father in January of this year.  Mr. Barnhill's surviving parent is now in her 70's.

Mr. Barnhill has permanently lost his job.  He is subject to the humiliation of sex offender status upon his release.  This designation will impact not only his future job prospects, but his ability to reside and move about in the community.

While the government acknowledges that Mr. Barnhill did not use his police powers, and the witnesses did not know he was a police officer, the government still states that it took into account Mr. Barnhill's profession, and consequent "special duty to the community and that it violated that trust" in its proposed sentence.

This profession will carry still more punishment for Mr. Barnhill.  Due to his profession, Mr. Barnhill will be subject to, at a minimum, extra scrutiny while incarcerated.  His profession, which he has lost due to this case, carries extra risks for him while incarcerated.

Mr. Barnhill has already been subjected to a sensationalistic, humiliating, media frenzy in this case due to his profession.  Shortly before Mr. Barnhill was arrested, the government unfortunately arrested another officer on more serious charges, unrelated to Mr. Barnhill.  That officer allegedly did use his police powers

10

to commit an offense.  Cameramen and photographers were camped out at Mr. Barnhill's apartment for days.  He was publicly linked to the other officer's unrelated case, which had different facts from his own.  In fact, the government exhaustively investigated both cases, and confirmed that each case was isolated and unrelated to the other.  But that did not stop the false speculation.  The death of the other officer, a suspected suicide, only heightened the wild speculation, with Mr. Barnhill the main subject.  Misinformation has been published, with no recourse for Mr. Barnhill.    Counsel submits that Mr. Barnhill has already received additional punishment based on his profession, and will likely continue to do so in prison.

Unlike other public servants, he accepted responsibility early in the case, avoiding further expenses for preparation and trial of the case, and sensationalistic publicity for the government witnesses and the public at large.  He accepted a pre-indictment plea, all the while agreeing to extensions for the government to further investigate the case.  He also accepted voluntary suspension without pay from the police department within 2 days of arrest, and voluntarily resigned absent any plea negotiations.  He thus saved the city a great deal of money contesting his police status.  This is in contrast to other cases in which convicted officers have contested their suspension or termination.

According to the government, all 3 government witnesses in this case are adamant that they do not want  the case to continue, or further participate in the case. Two of the witnesses have refused further contact with the government.  The government states that the witnesses had a difficult history prior to meeting Mr. Barnhill.  Two of the witnesses were previously reported as runaways  - one on 8 occasions, and the other 18 times.  It should be noted that when they met Mr. Barnhill they did not stay overnight at his apartment, and their actual living locations during this time were unknown.

The pending nature of the case also takes its toll on Mr. Barnhill.  He consented to multiple continuances while the government investigated the case. Most recently, he agreed to postpone sentencing for the government to continue to contact the witnesses.  This sentencing postponement was particularly difficult, as a sentencing date and hopeful final decision had been previously set for a month earlier.  This state of limbo, while awaiting a decision, has been very difficult.

*The need to avoid unwarranted disparity in sentencing.*

The government has cited comparative cases in its sentencing memorandum, which are discussed further, below.

Pandering cases typically involve coercion of the complainant, as in the comparative cases sighted by the government.  Here, Mr. Barnhill did not use coercion, threats or violence.  Nor did he make any attempt to override any decisions made by the females.  In fact both comparative pandering cases cited by the government involved threats and violence against juveniles.  Furthermore, while Mr. Barnhill pled guilty to two counts of pandering, only one of the counts actually entailed a sexual act.

The government acknowledges that this child pornography case is atypical, as it involved a 17- year- old in a legal, consensual, underlying act.  The video was not distributed or intended to be distributed.  The Guidelines do not even remotely account for these factors.

Pandering cases:

United States v. Bell, D.C. Superior Court Case no. 2012-CF1-12430.  Mr. Bell received a seven-year term for recruiting and transporting a 16-year-old and a 19-year-old for prostitution.  He placed ads on internet pages, transported them to hotels, took all of the proceeds of the multiple acts of prostitution, threatened the

teens, carried 2 weapons, and told the teens to lie to the police, if stopped. Certainly, his acts were far more egregious than those of Mr. Barnhill.

United States v. Braithwaite, Case no. 11-cr-186 (JEB).  In that case the defendant used threats and violence, including a firearm, to prostitute at least 3 juveniles on multiple occasions, including a 14-year old, while retaining all of the proceeds of the acts.  He pled guilty on the eve of trial, and was sentenced to a 11(c)(1)(C) plea to 10 years incarceration.  In contrast, Mr. Barnhill's case involves no threats or violence, an early plea, and far less egregious facts.

Child pornography cases:

The government can cite no case in this jurisdiction involving a 17-year-old complainant.

United States v. Solano, Case No. 13-cr-182 (RMC).  A high school teacher communicated with numerous students and former students, and pled guilty to requesting and receiving images of the penis of a 16-year-old.   The government stated that he had been engaging in this type of contact with students and former students for years.  This defendant specifically abused his position of trust, had knowledge of the ages of the complainants, and committed illegal acts over the course of years.  He received a 5-year sentence, far below the recommended sentence under the Sentencing Guidelines.

United States v. Hanlon, Case no. 13-cr-283 (GK).  The defendant in that case communicated with multiple young girls, including pre-pubescent girls. He solicited and received explicit videos from a 12-year-old and a 15-year old.  He also traveled to a location with the specific intent to have sex with an undercover officer who he believed to be a 12-year-old child.  He received an 8-year sentence.

*Deterrence*

Given Mr. Barnhill's age, health problems, and the corollary consequences of his sentence, seven years imprisonment is more than sufficient deterrence for Mr. Barnhill.   Particularly for a first offender, the sentence will act to ensure that Mr. Barnhill will not commit any crimes after release.

It should be noted that there is no empirical evidence that there is a relationship between sentence length and general or specific deterrence, regardless of the crime.  See, e.g,  Andrew von Hirsch, et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999)(concluded that correlations between sentence severity and crime rates were statistically insignificant).   Indeed, the Sentencing Commission has found that '[t]here is no correlation between recidivism and guidelines' offense level..." U.S. Sentencing Commission, Measuring Recidivism; The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004).

Considering Mr. Barnhill's age, as well as his first offender status, the defense submits that a term of supervised release of no more than 5 years is sufficient to penalize and act as a deterrent for Mr. Barnhill.

## CONCLUSION

While it is clear from friends and family who have known him for years that Mr. Barnhill would not intentionally hurt another human being, he pled guilty because he recognizes that his actions in this case have in fact caused real hardship both in the general community, and for those individuals in the case.  The government exhaustively investigated this case prior to his guilty plea, and found no other illegal activities involving minors.  The recent illegal actions of Mr. Barnhill concerning

14

minors were out of character with his prior life, and were isolated. While considering suicide prior to his arrest for this case, he realized that he still has value, and that he must resolve his case and move forward, in the interests of both the community and Mr. Barnhill.  He did not use violence or threats of violence, and there is no reason to believe that he would repeat these acts.  His actions post-arrest, including his early voluntary suspension and resignation, as well as his early guilty plea, show real remorse.    Even though the offense did not involve his job, the government acknowledged that the nature of his job was a factor in its proposed sentence.

A 7-year sentence of incarceration for this 48-year old first offender with physical and mental health problems, the permanent loss of his career, and his clear and continuing public humiliation is an extremely harsh sentence.

Given his medical history, and the medical history of his family, the sentence means that he could spend, at a minimum, a substantial part of the rest of his life in prison.  The sentence is more than sufficient to meet the goals of sentencing.

For these reasons, Mr. Barnhill urges that the plea agreement under Rule 11(c)(1)(C) be accepted.

Respectfully submitted,

_____/s/_____

Joanne D. Slaight, #332866
400   7th   Street, N.W.,   Suite 400
Washington, DC  20004
Phone (202) 408-2041
Email:   jslaight@att.net